IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNIVERSITY OF VIRGINIA PATENT FOUNDATION, | CIVIL NO. 3:08-cv-00025 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| GENERAL ELECTRIC COMPANY d/b/a/ GE HEALTHCARE, | JUDGE NORMAN K. MOON |
| *Defendant.* | |

This matter is before the Court upon Defendant's Motion for Summary Judgment of Intervening Rights (docket no. 185) and Plaintiff's Motion for Certification to Appeal (docket no. 188). The Court has fully considered the arguments and authorities set forth in the parties' filings, as well as those presented at the April 27, 2011 hearing. For the following reasons, the Court will deny Defendant's Motion for Summary Judgment of Intervening Rights and deny Plaintiff's Motion for Certification to Appeal.

## I. BACKGROUND

Plaintiff University of Virginia Patent Foundation ("Patent Foundation") alleges that Defendant General Electric Company d/b/a G.E. Healthcare ("GE") infringed and continues to infringe United States Patent No. 5,245,282 ("'282 Patent") for an invention entitled "Three-Dimensional Magnetic Resonance Imaging." The '282 Patent describes an invention of "a rapid process for producing three-dimensional magnetic resonance imaging" through a pulse sequence which is referred to as 3D MP-RAGE. Claim 1, its only independent claim, provides:

In a method for producing a set of magnetic resonance three-dimensional image data, a preparation-acquisition-recovery pulse sequence cycle comprising the steps of:

a—a magnetization preparation period in which a series of at least one of RF pulses, gradient field pulses, and time delays are applied to encode the desired contrast properties in the form of longitudinal magnetization,

b—a data acquisition period, said data acquisition period including at least two repetitions of a gradient echo sequence to acquire data for a fraction of k-space,

c—a magnetization recovery period which allows T1 and T2 relaxation before the start of the next sequence cycle, and

d—repeating steps a, b and c until a predetermined k-space volume is sampled.

Claim 4, which is dependent on Claim 1, and was canceled by the Patent Foundation in reexamination, provides:

The method of claim 1, wherein said magnetization recovery period has a time of zero.

A more detailed summary of the procedural history of this litigation is included in the Court's two previous opinions on this matter. *See Univ. of Va. Patent Found. v. Gen. Elec. Co.*, 755 F. Supp. 2d 709 (W.D. Va. 2010) ("Opinion"); *Univ. of Va. Patent Found. v. Gen. Elec. Co.*, 755 F. Supp. 2d 738 (W.D. Va. 2011) ("Reconsideration Opinion"). Briefly, the '282 Patent was granted in 1993. In May 2008, the Patent Foundation brought this infringement action against GE. Subsequently, GE filed a third party request with the United States Patent and Trademark Office ("PTO") for *ex parte* reexamination of the '282 Patent, arguing that certain prior art anticipated or rendered obvious several claims of the '282 Patent, including Claim 1 and Claim 4. The PTO granted the request for reexamination because it raised substantial new questions of patentability. Upon reexamination, the PTO rejected all of the claims in question. Specifically,

2

the PTO rejected Claim 1 because it was anticipated and rendered obvious by prior art, and it rejected Claim 4 because it was rendered obvious by prior art.  Despite its earlier position that Claim 4 was patentable over prior art, the Patent Foundation filed an Amendment canceling Claim 4.  The Patent Foundation argued to the PTO that the magnetization recovery period in Claim 1 must be a finite period of time, and therefore Claim 4 improperly depended from Claim 1 because it disclosed a magnetization recovery period of time zero.  The Patent Foundation proceeded to distinguish the '282 Patent from prior art on the basis of the existence of a finite magnetization recovery period that allows T1 and T2 relaxation.  Based on the Patent Foundation's response, the PTO withdrew all of its rejections of the claims (except for those pertaining to the canceled Claim 4) and issued the reexamination certificate on May 4, 2010. The PTO specifically relied upon the fact that the magnetization recovery period corresponded to a finite period of time in order to distinguish the sequencing process disclosed in the '282 Patent from similar processes disclosed in prior art.

After reexamination concluded, GE moved for partial summary judgment, requesting a finding of no liability for any infringement that occurred prior to the issuance of the reexamination certificate.  The parties also requested that the Court perform claim construction to resolve the meaning of disputed terms in the '282 Patent.  In the Opinion, I determined that from the period of the patent's filing date to its reexamination, the term "magnetization recovery period" encompassed the possibility of having a duration of zero.  I then held that the Patent Foundation's arguments in reexamination and its cancellation of Claim 4 operated as a clear disclaimer of the possibility of the recovery period being zero and effectively narrowed the scope of the claim without explicitly amending its language.  After I found that the meaning of "magnetization recovery period" was changed in reexamination, I proceeded to hold that the

3

change was substantive, and, pursuant to 35 U.S.C. §§ 307(b) and 252, that the Patent Foundation was precluded from collecting for infringement of Claim 1 prior to the issuance of the reexamination certificate. Accordingly, I granted GE's motion for partial summary judgment, which sought a judgment of no liability on all claims of infringement prior to reexamination. *Univ. of Va. Patent Found.*, 755 F. Supp. 2d 709. The Patent Foundation moved for reconsideration of the Opinion, which I denied. *Univ. of Va. Patent Found.*, 755 F. Supp. 2d 738.

Presently, the Patent Foundation moves the Court to certify the Opinion and the Reconsideration Opinion for an interlocutory appeal to the United States Court of Appeals for the Federal Circuit. GE moves for summary judgment of absolute and equitable intervening rights. Pursuant to a stipulation by both parties, I stayed the proceedings pending the outcome of the instant motions.

## II. APPLICABLE LAW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

4

Once a motion for summary judgment is properly made and supported, the non-moving party may not rely merely on allegations or denials in its own pleading, rather it must set out "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When considering a summary judgment motion, the court must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### III. MOTION FOR CERTIFICATION TO APPEAL

The procedure for appealing interlocutory orders of the district court is governed by 28 U.S.C. § 1292(b), which provides, in pertinent part, as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

In summary, leave to file an interlocutory appeal should be granted only when (1) the order involves a controlling question of law, (2) as to which there is a substantial ground for a difference of opinion, and (3) immediate appeal would materially advance the termination of the litigation. To show that an interlocutory appeal is warranted under § 1292(b), the burden is on the prospective appellant to demonstrate "that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978); *see also Lovelace v. Rockingham*

5

*Mem'l Hosp.*, 299 F. Supp. 2d 617, 623 (W.D. Va. 2004) ("[Section] 1292(b) should be used only sparingly and, thus, its requirements are strictly construed.").  Because interlocutory appeals should be granted only in limited circumstances, the requirements for granting an interlocutory appeal "are to be strictly construed and applied."  *North Carolina ex rel. Howes v. W.R. Peele, Sr. Trust*, 889 F. Supp. 849, 852 (E.D.N.C. 1995) (citing *Myles v. Laffitte*, 881 F.2d 125 (4th Cir. 1989)).[1]

The Patent Foundation seeks certification of the Opinion and Reconsideration Opinion based on the following four questions:   "(1) whether 35 U.S.C. § 307(b) can be applied to claim 1, which was not amended in the reexamination; (2) whether the claim 1 'magnetization recovery period' can have different constructions before and after the reexamination certificate; (3) whether it was proper to construe claim 1 to have an optional 'magnetization recovery period' before the reexamination certificate; and (4) whether the Court properly found a prosecution disclaimer of a claim 1 'magnetization recovery period' of zero."   (Pl.'s Mot. Certification Appeal 1.)   I cannot grant the Patent Foundation's motion because none of the questions identified by the Patent Foundation involve a controlling question of law, and an immediate appeal of the Opinion and Reconsideration Opinion will not materially advance the termination of the litigation.

The United States Court of Appeals for the Fourth Circuit has defined a controlling question of law to be one that presents a "narrow question of pure law whose resolution will be completely dispositive of the litigation, either as a legal or practical matter, whichever way it

---

[1] The law of the regional circuit, in this case, that of the United States Court of Appeals for the Fourth Circuit, is used to determine procedural questions not unique to patent law.  *Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 342 F.3d 1290, 1294 (Fed. Cir. 2003); *Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1369 (Fed. Cir. 1999).  I also take guidance from the decisions of the United States Court of Appeals for the Federal Circuit on whether to grant interlocutory review of an order certified for appeal by a district court.  *See, e.g.*, *Century Wrecker Corp. v. Vulcan Equip. Co.*, 902 F.2d 43 (Fed. Cir. 1990) (unpublished); *Vectra Fitness, Inc. v. Pac. Fitness Corp.*, 135 F.3d 777 (Fed. Cir. 1998) (unpublished).

goes." *Fannin v. CSX Transp., Inc.*, No. 88-8120, 1989 U.S. App. LEXIS 20859, at *16, 1989 WL 42583 (4th Cir. Apr. 26, 1989); *see also Lovelace*, 299 F. Supp. 2d at 623.  Although the question whether 35 U.S.C. § 307(b) applies to a claim that was not explicitly amended in reexamination is a narrow question of pure law, its resolution on appeal would not dispose of the present suit as either a legal or practical matter.  Following from my interpretation that the term "amended" in § 307(b) was not limited to explicitly amended claims, I held under 35 U.S.C. § 252 that GE was protected from liability for any infringement prior to the issuance of the reexamination certificate.  This decision disposed of a substantial portion of the period of time of infringement for which redress is sought.  If § 307(b) is determined on appeal not to apply to the circumstances here, then the litigation would continue on the claim of infringement of the entire period alleged, including the period before the issuance of the reexamination certificate.  Such a result would not dispose of the litigation.  To the contrary, it would increase the length of time of infringement at issue for trial.  For this reason, certifying this question for appeal would also not materially advance the termination of the litigation.

The Patent Foundation argues that immediate appeal would conclusively settle the time period for which GE can be held liable for infringement, which would better position the parties for settlement.  Given the heavily contested nature of this litigation to date, any possibility of settlement is simply too speculative to give weight in this consideration.  The Patent Foundation also asserts that it would be inefficient to proceed with litigation of the few remaining issues, at the risk that the Court's judgment will be reversed and the parties will need to litigate claims for the entire period of infringement.  But with most of the time period of infringement removed from the case, it seems more efficient to address the remainder and allow the entire matter to be

appealed from the final judgment of the district court.  I am not convinced that any pretrial effort and expense will be saved by certification.

The question whether the magnetization recovery period in Claim 1 can be given different constructions before and after reexamination would also not be completely dispositive of the litigation or materially advance the completion of the litigation.  If it is found that the term must be given only one construction, then it is likely that GE would not merit a finding of no liability prior to reexamination because there would be no substantive change in the meaning of magnetization recovery period.  As with the first question for certification, this outcome would enable claims for the entire period of alleged infringement to proceed to trial, rather than remove claims or speed the case to completion.

The third and fourth proposed questions for certification do not present issues that would be completely dispositive of the litigation, nor do they present questions for which there are substantial grounds for a difference of opinion.  The Federal Circuit has stated that even though parties often desire to make interlocutory appeals from claim construction decisions made by district courts, no special accommodation for these requests should be given.  *Nystrom v. TREX Co.*, 339 F.3d 1347, 1350 (Fed. Cir. 2003) ("[P]iecemeal litigation is as strictly precluded by the rule of finality for patent cases as it is for any other case.  Until the rules are changed, the parties and the district courts are obliged to conclude patent cases in strict compliance with the finality rule to avoid unnecessary litigation over jurisdictional issues in perfecting an appeal.").  In addition, determination of these two issues requires scrutiny of the factual record of the reexamination proceedings and of the claims and specification of the '282 Patent.  Interlocutory appeal is not meant to embroil courts of appeal in factual details.  *Fannin*, 1989 U.S. App. LEXIS 20859, at *15.  Review of the Court's construction of "magnetization recovery period"

would require an understanding of the concepts underlying the '282 Patent and a familiarity with its claims and specification.  Review of the Court's determination that the Patent Foundation disclaimed a portion of the meaning of Claim 1 in reexamination would require examination of the entire prosecution record on reexamination.  These questions of law are too "heavily freighted with the necessity for factual assessment" to be appropriate for interlocutory review. *Id.*

### IV. MOTION FOR SUMMARY JUDGMENT OF INTERVENING RIGHTS

An alleged infringer of a reissued or reexamined patent may be protected from liability by the second paragraph of 35 U.S.C. § 252, which sets forth the intervening rights of the alleged infringer.  The second paragraph of § 252 provides for two separate and distinct defenses under the doctrine of intervening rights:  absolute intervening rights and equitable intervening rights. *BIC Leisure Prods. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220 (Fed. Cir. 1993).  The second paragraph consists of two sentences which address two distinct situations and provide two different types of protection.  *Id.*

The first sentence defines absolute intervening rights.  It provides:

> A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

35 U.S.C. § 252, ¶ 2, sent. 1.

This sentence provides an accused infringer with the absolute right to use or sell a product that was made, purchased, offered to sell, or used before the grant of the reissue or

reexamined patent as long as this activity does not infringe a claim of the reissue or reexamined patent that was in the original patent. *See BIC Leisure Prods.*, 1 F.3d at 1220-21. This absolute right extends only to anything made, purchased, offered to sell, or used before the grant of the reissue or reexamined patent. *See id.* In other words, it covers products already made at the time of reissue or reexamination. *Id.* Because of the activity prior to reexamination, an infringer might enjoy an intervening right "to continue what would otherwise be infringing activity" after reexamination. *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 756 F.2d 1574, 1579 (Fed. Cir. 1985) ("*Seattle Box II*").

The second sentence of the second paragraph of section 252 defines equitable intervening rights. It provides:

> The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

35 U.S.C. § 252, ¶ 2, sent. 2.

By its terms, this sentence provides for the court to grant much broader rights than does the first sentence. *BIC Leisure Prods.*, 1 F.3d at 1221. The second sentence permits the continued manufacture, use, offer for sale, or sale of additional products covered by the reissue or reexamined patent when the infringer made, purchased, offered for sale, or used identical products, or made substantial preparations to make, use, offer for sale, or sell identical products, before the date of the issuance of the reexamined patent. *See id.* This equitable right is not

absolute.  *Id.*  The court may only provide for the continued manufacture, use, offer for sale, or sale "to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced . . . ."  35 U.S.C. § 252, ¶ 2, sent. 2.

GE seeks intervening rights for any infringing activity that occurred after the issuance of the reexamined patent.  The '282 Patent disclosed a method for producing a set of magnetic resonance three-dimensional image data, also called a pulse sequence.  In GE's commercial MRI systems, a pulse sequence is programmed in a software application on a computer used to control the MRI scanner.  (Bayram Decl. ¶ 3, Mar. 3, 2011.)  It is only by the execution of the software application that an MRI scanner will perform a pulse sequence for MRI imaging.  (*Id.*)

At the outset, the Patent Foundation claims that intervening rights are not available where "the making, using, offering for sale, or selling of [the specific thing] infringes a valid claim of the reissued patent *which was in the original patent*."  35 U.S.C. § 252, ¶ 2, sent. 1 (emphasis added).  The Patent Foundation argues that Claim 1 "was in the original patent" because the text of the reexamined Claim 1 is identical to that of Claim 1 in the original patent, and no explicit amendment was made to Claim 1.  Under GE's view, to determine whether a claim in the reexamined patent "was in the original patent," the court should apply the same standard that is used to determine whether "the claims of the original and reissued patents are substantially identical" under the first paragraph of § 252.  If that standard were applied, intervening rights would not be available where the infringed claim in the reexamined patent was "without substantive change" from the original patent.

In essence, the Patent Foundation urges the Court to inquire whether the claim language was literally altered, regardless of whether its meaning was substantively changed, whereas GE proffers an interpretation that asks whether the claim meaning was substantively changed,

11

regardless of whether its language was literally altered.  I find that GE's interpretation is a better understanding of the phrase "was in the original patent."  Here, in the original '282 Patent, Claim 1 disclosed a process that involved the repetition of a magnetization preparation period, a data acquisition period, and an optional magnetization recovery period.  In contrast, the reexamined Claim 1 disclosed a process in which the magnetization recovery period was a mandatory step in the process.  To say that the reexamined Claim 1 "was in the original patent" simply because it had not been textually amended would ignore the substantial difference in coverage between the reexamined claim and the original claim.  In reality, the invention described by the reexamined Claim 1 is not the same as the one disclosed in the original patent, and therefore the claim cannot be said to be "in the original patent."

GE's approach is also more consistent with the operation of the first paragraph of § 252. I held in the Opinion that a claim can be "amended" through a clear disclaimer of its meaning in the prosecution of the reexamination and a corresponding cancellation of a related, dependent claim, without a literal change in its claim language.  I found that this change in the meaning of the claim could entitle an alleged infringer to a judgment of no liability prior to the issuance of the reexamination certificate because the meaning of the claim had been substantively changed under § 252, even where the language of the reexamined claim remained identical to the language of the original claim.  While I recognize that the terminology employed in the second paragraph of § 252 differs from that in the first paragraph of § 252 and from that in § 307(b), I see no reason why Congress would intend for an alleged infringer in GE's position to be protected from liability prior to the issuance of the reexamination certificate, yet remain liable for infringement after its issuance for specific items it made or used prior to the issuance.

Although the Federal Circuit has not addressed this question, the manner in which it has applied the doctrine of intervening rights comports with my interpretation of "was in the original patent."  In *Seattle Box I*, the Federal Circuit first held that the claims in the reissued patent were substantively different than those in the original patent under paragraph one of § 252, and therefore the alleged infringer could not be held liable for any activities performed before the reissue patent date.  *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 828 (Fed. Cir. 1984).  It then considered whether the alleged infringer was protected by the doctrine of intervening rights.  It held as follows:

> The only question to ask under this test is whether claims of the original patent which are repeated in the reissue patent are infringed.  .  .  .  If valid claims in the original patent appear unaltered in the reissue patent, the doctrine of intervening rights affords no protection to the alleged infringer.
>
> We have already held, however, that the claims appearing in Seattle Box's reissued patent are substantively different than those in the original patent.  That is, Seattle Box repeats *no* claim from its original patent in its reissued patent.  Industrial, therefore, may properly raise a defense of intervening rights.

*Id.* at 830.  The Patent Foundation urges the Court to interpret the phrase "appear unaltered" (which is used in the quoted passage above) in the literal sense of whether the language of the claim had been altered.  But what I find significant is that the Federal Circuit referenced its determination from the § 252 first paragraph analysis that the claims were "substantively different" to reach its conclusion that intervening rights were available.  Certainly, it could have simply rested on the fact that the language of the claims had been literally changed, but instead it looked to whether the language had been substantively changed.

The Federal Circuit's treatment of intervening rights in *Seattle Box I* was explained and applied in *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970 (Fed. Cir. 1986).  In *Kaufman*, the court

described *Seattle Box II* as having "noted that because it had determined that the reissue claims in that case were *substantively* different from the original claims, the infringer could raise a defense of intervening rights."  807 F.2d at 978.  The *Kaufman* court then reasoned that, having already held that the claims of the reexamined patent were not substantively different from those in the original patent, under the "was in the original patent" exception, intervening rights could not be asserted.  *Id.*  In doing so, the Federal Circuit rejected the alleged infringer's argument that *any* amendment made during the reexamination proceeding is substantial and therefore automatically entitles the infringer to an intervening right.  *Id.*  The Federal Circuit stated that "the cases have consistently construed the second paragraph of § 252 as requiring that a substantive change be made to the claims in reissue before an infringer is entitled to an intervening right."  *Id.* (collecting cases).  The approach taken in *Seattle Box I* and *Kaufman* has been reduced to the following statement of law:  "Once a determination is made that the claims are not 'identical' within the meaning of the first paragraph of section 252, the defense of intervening rights under the second paragraph of section 252 can be raised."  *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 742 (Fed. Cir. 1993).  These cases teach that that standards applied in the first paragraph of § 252 should be used to determine whether a valid claim in the reexamined patent was in the original patent for the purpose of deciding an alleged infringer's entitlement to intervening rights.  Thus, the defense of intervening rights may be raised here.

Separately, the Patent Foundation argues that the doctrine of intervening rights does not apply where the claims of the original patent were narrowed by reexamination, rather than broadened by reissue.  Where the claims have been narrowed, contends the Patent Foundation, the broad claims in the original patent put the potential infringer on notice of the narrowed scope of the reexamined claims, and intervening rights should not be awarded.  *See Henkel Corp. v.*

*Coral, Inc.*, 754 F. Supp. 1280, 1308 (N.D. Ill. 1990) (finding that potential infringer was not entitled to equitable intervening rights because scope of reissue patent was narrowed rather than broadened).

In *Engineered Data Products v. GBS Corp.*, 506 F. Supp. 2d 461 (D. Colo. 2007), the court addressed and rejected this precise argument. There, Engineered Data Products ("EDP"), which was the holder of a patent on a labeling device, filed suit against GBS Corp. for infringement. In reexamination, several claims were cancelled and others were amended in order for EDP to obtain a reexamination certificate. In addressing the present argument, the court stated:

> First, EDP asserts that the defense of intervening rights only applies when the original claims have been broadened on reexamination. Because GBS alleges that the claims of the '674 patent were narrowed during examination, EDP argues that even if its patent claims were substantively changed in this manner, GBS's intervening rights defense fails as a matter of law.
>
> I find no merit in this argument. Section 305, which governs reexamination proceedings, prohibits an applicant from broadening a claim during reexamination. *See* 35 U.S.C. § 305; *Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1343 (Fed. Cir. 2002). Section 307(b), meanwhile, expressly provides for the application of § 252's intervening rights defense to reexamined claims, which would be unnecessary if EDP were correct that intervening rights only apply to broadened claims.

506 F. Supp. 2d at 467. I am persuaded by the rationale set forth in *Engineered Data Products*. That approach is also consistent with the Federal Circuit's application of the first paragraph of § 252 to narrowing amendments. *See Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247, 1251 (Fed. Cir. 1997). Further, the language of § 252 itself does not limit intervening rights to claims that have been broadened. With those preliminary legal issues disposed of, I will proceed to consider GE's entitlement to absolute and equitable intervening rights.

15

## A.  Absolute Intervening Rights

GE seeks absolute intervening rights for all claims of infringement after the issuance of the reexamination certificate on May 4, 2010.  GE must show that it is entitled to judgment as a matter of law that it is not liable for any infringement of the '282 Patent between May 4, 2010 and June 28, 2011, which is the date the '282 Patent expires.  An absolute intervening right only allows the defendant to continue to use or sell "the specific thing" that was made, purchased, offered for sale, or used prior to the grant of the reissue or reexamined patent.  *See BIC Leisure Prods.*, 1 F.3d at 1220-21; *see also* P.J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 46 (1954) ("The specific things made before the date of reissue, which infringe the new reissue claims, are absolutely free of the reissued patent and may be used or sold after the date of the reissue without regard to the patent.").

"[A] 'specific thing' qualifies for absolute intervening rights only if in existence at the time of reissue." *Shockley v. Arcan*, 248 F.3d 1349, 1360 (Fed. Cir. 2001) (stating that "the specific thing" refers "to the *tangible article*" which "was in existence" prior to reissue) (emphasis added).  For example, in *BIC Leisure Products*, the court allowed the infringer an absolute intervening right to sell 10,870 sailboards that infringed the patent in suit because 5,245 of those sailboards had been manufactured before the reissue date and were being held in inventory, and another 5,625 sailboards had been purchased by the infringer by binding contract before the reissue date.  1 F.3d at 1222.  In *Shockley*, the court held that absolute intervening rights did not protect the infringer's importation and sale of 10,000 mechanic's creepers[2] because those creepers had not been manufactured prior to the reissue date.  248 F.3d at 1360.  These decisions reflect an understanding that the statutory framework limits the protection afforded by

---

[2] A mechanic's creeper is a flat base surface on wheels that enables mechanics to lie on their backs while working under an automobile.  *Shockley*, 248 F.3d at 1353.

absolute intervening rights, but allows much broader rights to continue to make and use additional products under equitable intervening rights.

The requirement that there be a specific thing in existence is difficult to apply to the present matter for two reasons.  First, the '282 Patent discloses a process, which consists of a series of acts or steps and is distinguishable from a product or apparatus, which is a tangible item.  *See In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002).  The Patent Foundation argues that absolute intervening rights do not apply to processes.  No provision for a patented process is made in the absolute intervening rights section.  By comparison, the statutory language governing equitable intervening rights explicitly allows "for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue."  35 U.S.C. § 252, ¶ 2, sent. 2.  Second, even if absolute intervening rights extend to a process, the pulse sequence process disclosed by the '282 Patent was embodied as several software applications, which, when loaded on to an MRI system and executed, practiced the patented process.  Viewing the facts in the light most favorable to the Patent Foundation, the software applications only existed as intangible information that was capable of being loaded on to an unlimited number of MRI systems.

I need not decide whether any patented process might merit the protection of absolute intervening rights because GE has made no showing in the instant motion that any "specific thing" in existence at the time of the issuance of this reexamined patent is entitled to such protection.  There has been no proof offered that the software applications were incorporated into specific MRI systems in existence and of the type sold by GE.  GE appears to take the position that because the allegedly infringing software applications had been developed prior to issuance of the reexamined patent, it should have full license to continue to use and sell those

applications.  But unlike sailboards or creepers, the pulse sequence software did not constitute physical inventory that the infringer would need to dispose of to avoid a loss.  No "specific thing" can be identified here, thus no limit can be placed on the automatic entitlement to continue infringing activity under absolute intervening rights.  To allow GE the broad right to incorporate its software into an unspecified number of MRI scanners designated for sale, for the remaining life of the patent, would not be consistent with the circumscribed nature of the absolute intervening rights defense.  Under the equitable intervening rights inquiry, a court can provide for the continued manufacture and sale of infringing things, as well as for the continued practice of any process patented by the reexamined patent.  It is the more appropriate vehicle to consider the intervening rights, if any, GE has to continue allegedly infringing activity.

### B.  Equitable Intervening Rights

The remedy of equitable intervening rights is "calculated to protect an infringer's preexisting investments and business."  *Seattle Box II*, 756 F.2d at 1580.  In determining whether an accused infringer is entitled to equitable intervening rights, a court considers whether substantial preparation was made before the issuance of the reexamined patent; whether there were existing orders or contracts at the time of the issuance of the reexamined patent; whether noninfringing goods can be manufactured from the inventory used to manufacture the infringing product, considering the cost of conversion; and whether the accused infringer was acting in good faith.  *Seattle Box II*, 756 F.2d at 1579-80.

According to GE's evidence, GE's pulse sequence software applications were all developed before May 4, 2010.  In fact, one of its applications was made as far back as 1993 and first offered as a product in 1994.  (Bayram Decl. ¶ 9.)  The design of the pulse sequence application, as part of an MRI system, is regulated by the U.S. Food and Drug Administration

18

("FDA").  *See* 21 U.S.C. § 360c(a)(1)(B); 21 C.F.R. §§ 820.20, 820.30, 892.1000.  To comply with FDA design verification requirements, GE imposed a strict quality management system on its pulse sequence applications.  (Bayram Decl. ¶ 12.)  Under this system, before any pulse sequence application was offered for commercial release, GE required the following be completed, with a formal review and approval:  (1) a design inputs plan; (2) a design output plan, (3) a design verification plan, (4) a design transfer plan, and (5) a design validation plan.  (*Id.* ¶ 13.)  Each step in the quality management system was carried out by several GE personnel, and the FDA procedures generally required six to eighteen months for GE to complete.  (*Id.* ¶¶ 16-17.)

The mere fact that GE imposed a quality management system in order to comply with FDA regulations in developing the software applications does not necessarily show that its preparation was substantial, and I must draw all reasonable inferences from the facts in favor of the Patent Foundation.  Dr. Ersin Bayram, the GE manager who submitted the declaration that constitutes the lion's share of GE's evidence to support this motion, did not attest that GE had invested substantial time or resources to develop the software applications.  Nor did GE provide evidence of any actual costs it incurred in developing the applications.  Although investment in obtaining FDA approval for a regulated product can certainly entail substantial resources, I have little evidence before me on this motion that such resources were expended.

In considering whether to use the court's "broad equity powers" to fashion a remedy, *Seattle Box II*, 756 F.2d at 1579, information about whether GE made profits sufficient to cover its initial investment in development of the pulse sequence software applications is pertinent, *see Plastic Container Corp. v. Cont'l Plastics of Okla., Inc.*, 607 F.2d 885, 902-03 (10th Cir. 1979).  *See also Seattle Box I*, 731 F.2d at 830 (stating that to exercise its equity powers properly, the

trial court "must carefully weigh *standard equitable considerations*") (emphasis added).  GE has been selling MRI scanners loaded with the allegedly infringing software applications for several years—in at least one case, since 1994—and damages cannot be assessed for this period of sales.  *See id.* (considering whether there was a long period of sales before the patent reissued for which damages cannot be assessed); *Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F. Supp. 1340, 1363 (E.D. Pa. 1977) (same), *aff'd*, 579 F.2d 41 (3d Cir. 1978).  An equitable intervening right to continue to sell the software applications would not be necessary for the protection of investments made before the issuance of the reexamined patent if the investments have long since been recouped.  The sales periods for each of the allegedly infringing software applications do not appear to be in the record, and no evidence has been supplied of GE's profits from those sales.

GE has also not shown that there were any existing orders or contracts at the time of the issuance of the reexamined patent.  GE's listing of products offered as of April 17, 2010 only suggests that certain products were being offered for sale as of May 4, 2010—such evidence does not show that there were any actual pending orders or sales.

Finally, I am not satisfied that GE has established that its development and sale of the software applications was done innocently or in good faith.  The consideration of innocence or good faith action in equitable intervening rights analysis has yet to be precisely defined.  In *Seattle Box II*, the Federal Circuit found it relevant that the alleged infringer relied on the advice of its patent counsel in attempting to design its product to avoid infringement, and the infringer's product did not literally infringe the original patent.  756 F.2d at 1580-81.  Some courts have interpreted the good faith factor that was applied in *Seattle Box II* to ask whether the alleged infringer relied in good faith on the advice of its counsel, *see Richardson-Vicks, Inc. v. UpJohn*

*Co.*, No. 93-556, 1996 U.S. Dist. LEXIS 702, at *25, 1996 WL 31209 (D. Del. Jan. 17, 1996), whereas other courts have treated it as a requirement that the alleged infringer "in good faith innocently develop and manufacture an invention not claimed by an original patent," *see Thayer v. Nydigger*, No. 95-2004, 1999 U.S. Dist. LEXIS 5886, at *36, 1999 WL 372552 (D. Ore. Apr. 15, 1999). An accused infringer may be characterized as "innocent" when it undertook substantial activities that because of reissue turn out to be infringement. *See Haden Schweitzer Corp. v. Arthur B. Myr Indus.*, 901 F. Supp. 1235, 1242 (E.D. Mich. 1995). An infringer may also be "innocent" when relying in good faith "on some perceived infirmity in the original patent." *Thayer*, 1999 U.S. Dist. LEXIS 5886, at *34. It has also been stated that "[i]nvestments made when a defendant was fully cognizant at all times of the questionable legal status of [its] conduct do not lend credence to a later request for equitable intervening rights." *Bendix Commercial Vehicle, Sys. LLC v. Haldex Brake Prods. Corp.*, 737 F. Supp. 2d 854, 858 (N.D. Ohio 2010) (quotations omitted).

In light of the court's broad equity powers to determine the need for an equitable intervening right, the inquiry should not be limited to good faith reliance on the advice of counsel, as the Patent Foundation argues. GE argues that it relied in good faith on the invalidity of the original patent, as evidenced by its prompt request for *ex parte* reexamination of the original patent claims as soon as the Patent Foundation brought suit. Yet seeking *ex parte* reexamination is a fairly common litigation strategy and does not by itself show that GE actually proceeded to develop and sell the allegedly infringing products based on the belief that the patent's claims could not be applied to it. For the reasons stated above, the evidence supplied by GE is insufficient to support its motion for summary judgment of equitable intervening rights.

## V. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment of Intervening Rights (docket no. 185) will be denied, and Plaintiff's Motion for Certification to Appeal (docket no. 188) will be denied.  The stay on the proceedings (docket no. 184) shall be lifted.  An appropriate order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this __27th__ day of May, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE